Filed 8/15/14  P. v. Bailey-Banks CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LARRY BAILEY-BANKS,<br><br>    Defendant and Appellant. | F065998/F065678<br><br>(Kern Super. Ct. Nos. BF134268A & BF134268B)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAYSHAUN DUPREE BROWN,<br><br>    Defendant and Appellant. | |

**THE COURT:**

It is ordered that the opinion filed herein on July 17, 2014, be modified as follows:

On page 29, at the end of the paragraph ending "and not from the docket entries contained in exhibit No. 3", the following paragraph is added:

Bailey argues that if this court does not reverse the judgment because of the admission of the exhibit, we should remand the matter and order the trial court to recall the jurors. Bailey contends the trial court must conduct an evidentiary hearing and question the jurors to determine if they looked at the documents, in order for Bailey to file a motion for new trial based on alleged prejudicial juror misconduct. As we have explained, however, defense counsel never objected to the admission of the exhibit, the record suggests a possible tactical reason for that omission, and there is no evidence the jurors looked at the exhibit. Moreover, defense counsel never asked the court to question the jurors before they were discharged, or for the jurors' contact information after the verdict was returned. We decline to remand the matter given the nature of the record before this court.

There is no change in the judgment. Bailey's petition for rehearing is denied.

_____

Poochigian, J.

WE CONCUR:

_____

Cornell, Acting P.J.

_____

Gomes, J.

2.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LARRY BAILEY-BANKS,<br><br>    Defendant and Appellant. | F065998/F065678<br><br>(Kern Super. Ct. Nos. BF134268A & BF134268B)<br><br>**OPINION** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAYSHAUN DUPREE BROWN,<br><br>    Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Larry Bailey-Banks, Defendant and Appellant.

Gregory L. Cannon, under appointment by the Court of Appeal, for Rayshaun Dupree Brown, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellants/defendants Larry Bailey-Banks (Bailey)[1] and Rayshaun Dupree Brown (Brown) were charged with multiple felonies and gang enhancements based on the burglary and robbery of a woman in her apartment. A third suspect, Andrew Smith, was also implicated. The People's theory was that Bailey drove Brown and Smith to the apartment complex, and Brown and Smith broke into the apartment and robbed the victim. Bailey and Brown were tried together, and they were convicted of burglary, robbery and other offenses. Bailey was sentenced to 26 years to life plus 20 years, and Brown was sentenced to 16 years. Prior to the joint trial, Smith pleaded no contest to burglary and was sentenced to nine years; he did not testify against Bailey or Banks.

### *Appellate issues*

Bailey and Brown filed separate appeals and briefs, and did not request to join the issues raised by the other defendant. Their cases will be administratively consolidated.

Brown raises only one issue – that the prosecutor committed prejudicial misconduct during closing rebuttal argument by improperly vouching for the strength of the People's case. Bailey joins in this issue.

Bailey separately raises several issues which Brown has not joined. Bailey contends the court improperly admitted an exhibit into evidence which it had previously

---

[1] Bailey-Banks testified at trial that he normally used "Bailey" as his last name. We will refer to him as Bailey.

excluded because it contained details of Andrew Smith's plea agreement; the jury was not correctly instructed on accomplices; the court should have instructed the jury on lesser included offenses of theft for count I, robbery; the jury failed to clarify whether he was convicted of first or second degree robbery; he could not be convicted as both a principal of burglary and robbery, and an accessory after the fact for the same crimes; he could not be convicted of burglary, robbery, and receiving stolen property; and one of the prior prison term enhancements must be stricken.

We reverse Bailey's conviction in count VI for receiving stolen property, and strike the prior prison term enhancements. In all other respects, we affirm the judgments of convictions against both Bailey and Brown.

## FACTS

On October 21, 2010, Jacqueline Garcia and her children lived in an apartment on Pacheco Road and Eve Street in Bakersfield. At some point before noon, Garcia was resting in bed, and her children were not home. She was awakened by noise coming from her kitchen window, and the sound of someone falling from a height. Garcia testified two young men suddenly appeared in her bedroom. One man put his hand over Garcia's eyes and mouth, held a gun to her head, and pushed her to the floor. The gunman told her to get up, and he took her around the apartment. The gunman told his accomplice to start looking for stuff. Garcia could not speak English and could not understand what they were looking for.

Garcia testified the men looked through her home and made a "disaster of the place." The gunman seemed to be giving orders to the second man about what to do. The gunman continued to hold the gun to Garcia's head. The second man found a small safe. Garcia stored documents and jewelry in it, but it did not contain any money. The safe was locked, however, and the culprits did not know what was inside.

After they found the safe, the gunman again forced Garcia to the floor. She saw and heard the gunman pull back the slide and chamber a round in the gun. She also heard

3.

a metallic sound. She believed the gunman was going to kill her and thought she was dead. However, the gunman did not fire and both men left the apartment with the safe.

## The 911 call

Garcia was very afraid and tried to call the police, but she discovered the men had disconnected the telephone in her apartment. She ran to the manager's office and called 911.

At 11:42 a.m., the police received Garcia's 911 call. Garcia told the Spanish-speaking dispatcher that two black juvenile males entered her house through a window, they had a gun, and they forced her to the floor. Garcia said they took a box with all her personal documents.

## The initial investigation

Officers Juarez and Ashby responded to Garcia's apartment. Garcia was visibly shaken and very scared. The screen to the kitchen window had been removed, and the window was open. There were drawers and boxes which had been opened and tossed. The safe had been taken. The officers found a live nine-millimeter Luger bullet on the floor where the gunman had forced Garcia down.

Garcia reported the two suspects were African-American men. One suspect was about 19 years old, six feet tall, slim, and wore a black-hooded sweatshirt and a black mask. The other suspect was about 18 years old, five feet five inches tall, a thin build, in a dark shirt and blue jeans, and had shoulder length black hair.

The apartment complex's security camera depicted two shadowy figures leaving Garcia's first floor apartment at 11:41 a.m.

## Discovery of the safe

On the same day, Michael Bowen was cleaning out his apartment on North Half Moon Drive in Bakersfield. He spent the morning throwing out trash in the garbage can located in the alley behind his apartment. Later in the afternoon, he noticed a second

4.

garbage can had been pulled next to the garbage can he had been using. The second garbage can had not been there earlier in the day.

Bowen opened the lid and looked inside the second garbage can. He saw a small safe that appeared to have been slammed or pried open. There were numerous papers and documents inside and around the safe. Bowen called the police.

At 2:45 p.m., Officers Ashby and Juarez responded to Bowen's location in the alley. They looked through the safe and found numerous documents that belonged to Garcia. The same garbage can that contained the safe also contained utility bills addressed to defendant Bailey and his girlfriend, Tiffany Jackson.

**Garcia's identification of defendants**

Bailey and Jackson lived in the same apartment complex as Bowen, just a few doors down from Bowen's residence. Officers Ashby and Juarez contacted Bailey and Jackson at their apartment. They detained Bailey and took him to a nearby school.

The officers received information about a suspicious person in the area of Bailey's apartment. Officer Ashby remained at the school with Bailey. Officers Woessner and Juarez located defendant Rayshaun Dupree Brown walking away from Bailey's apartment on North Half Moon Drive. Brown was detained.

The police asked Garcia to participate in separate infield showups of the two suspects. An officer drove her to the location where Brown had been detained, and she remained in the patrol car. The officer read the standard admonishment to Garcia and asked her to look at Brown, who was standing near another police car with an officer next to him. Garcia said Brown was one of the men who entered her apartment.

A few minutes later, an officer drove Garcia to the school where Bailey had been taken. Garcia remained in the patrol car. Bailey was removed from another patrol car and stood on the street. He was in handcuffs, and four officers were standing near him. After receiving appropriate admonishments, Garcia identified Bailey as one of the men who entered her apartment.

5.

The officers showed Garcia the safe that had been found in the garbage can. Garcia identified the safe and the contents as her property. The safe was dusted for fingerprints, but no usable prints were obtained.

At trial, Garcia identified Bailey and Brown as the two men who entered her apartment and robbed her. She did not know which man used the gun.[2]

**Bailey yells at Brown at the police department**

Bailey and Brown were arrested. Brown had a cell phone which contained a photograph of him making a hand gesture of the letter "W," and a separate photograph that showed the phrase "West Side."

Both defendants were taken to the police department and placed in separate but adjoining interrogation rooms, which had solid doors and walls. These rooms were located within the larger squad room, and the officers used them as holding cells. The defendants could not see each other, but they knew they were in the adjoining rooms.

Officers Woessner and Ashby removed Brown from the interrogation room and interviewed him in another area adjacent to the squad room. They asked Brown if he was involved in the burglary/robbery at the apartment on Pacheco Road. Brown said he did not have anything to do with it. The officers returned Brown to the interrogation room adjacent to where Bailey was still being held.

Officer Juarez testified he was in the squad room, and Bailey and Brown were in the adjacent interrogation rooms, when Juarez heard Bailey yell something at Brown. Bailey's voice was muffled but loud enough to be heard by the officers in the squad room.

_____

[2] As we will discuss below, Bailey was on parole and wearing a GPS tracking monitor. Based on the GPS tracking evidence, the prosecution theory was that Bailey drove Brown and Andrew Smith to the apartment, and remained in his car while Brown and Smith committed the burglary and robbery. At trial, the prosecutor conceded that Garcia's identification of Bailey as one of the burglars was incorrect.

Officer Woessner testified he was also in the squad room and heard Bailey talk to Brown in a loud voice through the wall, "something to the effect of, 'Tell those officers that I didn't do anything,' " and " 'You know my situation. I can't get another case,' or something similar to that."[3]

Shortly after the officers heard Bailey yell at Brown, Brown asked to speak to Officer Woessner again. Brown was removed from his interrogation room and questioned. Brown said he committed the robbery with a man known as "Lil' Rags" or "Baby Rags," who was later identified as Andrew Smith.[4] Brown did not implicate Bailey in any way. Instead, he said that Smith drove him to the apartment building and parked on the corner of Eve Street. Smith told Brown that someone lived in an apartment, and that person sold crystal methamphetamine and had cash. Smith climbed through the apartment's kitchen window and opened the front door for Brown. Smith pulled the gun and pointed it at the woman in the apartment. Brown searched the apartment and found the safe. Brown said he grabbed the safe, and they left the apartment. Brown dropped the safe. Smith helped him carry it, and they went back to Smith's car. They drove to the alley and tried to open the safe. Smith threw the safe against the ground.

**The GPS monitoring device on Bailey**

At the time of the crime, Bailey was on parole as a gang member, and was required to wear a GPS monitoring device. The GPS device showed the subject's

---

[3] Officer Woessner testified about Bailey's statements to Brown when he was recalled as a defense witness for Brown, as part of Brown's defense theory that he confessed to the burglary/robbery because he was intimidated by Bailey.

[4] As we will discuss in issue I, *post*, Andrew Smith was arrested sometime after defendants were taken into custody, and separately charged with the burglary and robbery of Garcia. The court denied the People's motion to consolidate his case with Brown and Bailey. Smith pleaded to burglary prior to the joint trial for Bailey and Brown.

locations, and when the subject was walking, traveling at a faster rate in a vehicle, or not moving at all.

The officers retrieved Bailey's GPS tracking data after Bailey had been arrested. Bailey's GPS tracking data showed that on the day of the burglary/robbery, he was on Pacheco Road at 11:28 a.m., and moving at 40 miles per hour, presumably in a vehicle. At 11:29 a.m., he was not moving and was stationary. At 11:32 a.m., he moved to a different location. At 11:34 a.m., he was stationary, and near the intersection of Pacheco Road and Pamela Street, which was near Garcia's apartment building. He remained at that location until 11:41 a.m., when he moved north on Eve Street at 30 miles per hour.[5] At 11:51 a.m., he was moving at 24 miles per hour. At 11:52 a.m., he was not moving and remained stationary at a residence in the area of North Half Moon Drive. At 11:57 a.m., he was walking at one mile per hour. At 11:59 a.m., he was stationary on North Half Moon Drive. At 12:03 p.m., he was moving on Edgemont Drive at 32 miles per hour.

## GANG EVIDENCE

Detective Travis Harless, a member of the Bakersfield Police Department's gang unit, testified as the prosecution's gang expert that Bailey, Brown, and Andrew Smith were members of the West Side Crips. The West Side Crips had geographical subset gangs which included 6th Street, Black Family, Q Court, Carnation Track, and Turq Rag.

The West Side Crips claim the color turquoise, the number six, and the letters "W," "WS," and "WSC." The gang's primary activities are murders, assaults, stabbings, shootings, carjackings, auto thefts, burglaries, and drug sales.

Lowell Park is in the middle of the West Side Crips' territory, and members of rival gangs are not allowed to enter the park. The gang regularly uses the park for

---

[5] At 11:42 a.m., Garcia called 911 and reported the burglary/robbery had just occurred.

8.

meetings and gang-related events, including the annual "Hood Day" on June 6. Detective Eric Lantz explained that on Hood Day, large numbers of the West Side Crips "don their turquoise colors and black T-shirts, things like that, and they will flood the Lowell Park and the surrounding areas" in the heart of West Side territory. The event is held on June 6 since the West Side Crips identify with "6/6," referring to the 6th Street subset gang, and the park is located on 6th Street.

### *Bailey's gang contacts*

The prosecution presented evidence that Bailey was an active member of the West Side Crips when the instant offenses were committed. Detective Lantz testified he had numerous contacts with Bailey, and described him as a "significant" person in the West Side Crips. In July and October 2006, Lantz had contacts with Bailey while he was in the presence of known members of the West Side Crips, including Clarence Wandick. Bailey had numerous tattoos that signified the West Side Crips. He said his moniker was "Skeeter," and he admitted membership in the gang.

Detective Lantz and other officers conducted surveillance during the Hood Day events held by the West Side Crips at Lowell Park in 2009 and 2010. There were over 100 people at the park, including known members of the West Side Crips. Bailey was present and associated with other gang members.

Bailey had been booked into county jail on 13 separate occasions. He claimed to belong to or associate with the West Side Crips and needed to be kept away from the rival Bloods and East Side Crips.

Detective Harless testified about a predicate offense which involved Bailey. On October 22, 2006, officers responded to a house within the territory of the West Side Crips on the dispatch about a man with a rifle. Bailey was present and detained, and the police recovered a loaded .22-caliber rifle. Bailey admitted he was a member of the West Side Crips and said his gang moniker was "Skeeter Bob." He was convicted of being a felon in possession of a firearm and participating in a criminal street gang (case

No. BF116639A).  Officer Harless believed he was an active gang member at the time, based on his review of the police report and conversation with the lead investigator.

In January 2010, Detective Harless arrested Bailey for possession of cocaine base; he was wearing a turquoise shirt and shoes.

### *Brown's gang contacts & the mall incident*

Detective Harless testified Brown was an active member of the West Side Crips. Brown never personally claimed to have a gang moniker.  Based on contacts with law enforcement, however, Harless believed Brown's moniker was "Lil Skeet" or "Lil Skee." The moniker likely denoted that a senior gang member or "big homie" named "Skeet" or "Skee" may have taken Brown under his wing and allowed him to use the same moniker as a "little homie."

Detective Harless testified Bailey was known as "Skeeter," "Skeet," and "Skee." Harless conceded there were other gang members who used the moniker "Skeeter."

Harless testified that Brown was arrested on July 17, 2009, after admitting he brandished a handgun at a man who was talking to his girlfriend at the mall.  The handgun had been stolen that morning during a residential burglary.  Brown claimed he had traded a bicycle to get the gun, and he needed it to protect himself from rival gangs. Brown was wearing a turquoise belt and said he was affiliated with the West Side Crips. Brown was with two other admitted members of the West Side Crips.  Based on this incident, Brown was convicted of possession of a firearm by a gang member and participation in a criminal street gang.

On October 11, 2010, an officer contacted Brown in territory claimed by the East Side Crips.  The officer asked Brown if he was a member of the East Side.  Brown said no, that he was from 6th Street.  The officer asked Brown if he was a West Side Crip. Brown said, " 'Yeah.  I am from 6th Street.' "

Detective Harless testified Andrew Smith was also a member of the West Side Crips and known as "Baby Rags."

Detective Harless testified about two predicate offenses which involved members of the Westside Crips engaged in the sale of cocaine, and one member being shot while he was selling drugs.

### *Hypothetical question*

The prosecutor asked Officer Harless to assume that two active members of the West Side Crips committed an armed robbery at a residence, took personal property from the victim, received a ride from a fellow active gang member to a place where the stolen property would be kept, and to assume the driver was possibly a "big homie."

Harless testified the suspects would have committed the offenses in association with members of the West Side Crips since they cooperated and worked together to commit the crimes, they left the scene together, and they took the stolen property to another location. The offenses were also committed at the direction of the gang since the "big homie" would have been in charge, and the younger gang members would have acted at his direction. The crimes also would have benefitted the gang since the money would have been used to buy narcotics and weapons.

## BAILEY'S DEFENSE

### Bailey's trial testimony

Bailey testified at trial that he socialized with the West Side Crips when he was 14 years old. He became an associate when he was 16 years old and a member when he was 17 years old. He was affiliated with the 6th Street subset of the West Side Crips. Bailey's gang moniker was "Skeeter" or "Skeeter Bob." There were other "Skeeters" in the gang. He was never called "Skee."

Bailey testified that Brown was his cousin, and he was not a member of the West Side Crips or any other gang.

Bailey testified members of the West Side Crips sold drugs, and committed robberies, burglaries, and shootings. Bailey's primary source of income was dealing rock

11.

cocaine, but he sold drugs to support his family and not to benefit the gang. He denied that he had "juice" or seniority within the gang.

Bailey was convicted of possession of rock cocaine for sale and served a seven-year prison term. He was released in July 2004. Within a few days, he violated parole by associating with gang members, and he was returned to prison. He was again released on parole but arrested and charged with possession of a rifle and rock cocaine. Bailey testified the incident happened while he was helping a friend move, and the contraband did not belong to him. In 2006, Bailey pleaded guilty to the weapon charge and admitted the gang enhancement. He obtained his gang-related tattoos while he was in prison so he could fit in.

Bailey was released from prison in 2008. He moved out of the West Side Crips territory and lived with his sister. He later moved into an apartment with his fiancée, Tiffany Jackson, on North Half Moon Drive.

Bailey testified that he had lost interest in the gang. He stopped hanging out in their territory, covered his gang tattoos, and took classes to become an oil field worker. He also enrolled in Bakersfield College. Bailey claimed that a member could drop out of an African-American gang for no reason without facing retaliation. He covered a gang tattoo on his cheek by having a tattoo artist perform a procedure so the tattoo became part of his skin tone. He was in the process of that procedure when he was arrested in this case.

Bailey disputed the officers' testimony about Hood Day, and testified the event was a neighborhood picnic and not a gang activity. He admitted gang members attended the picnic at Lowell Park, which was within the West Side's territory. He denied that he was at the event in 2010 because he would have violated parole since gang members would have been there. Bailey claimed he was at an amusement park in Southern California on that day.

12.

### *The charged offenses*

Bailey testified that on the morning of the burglary/robbery, he was at his apartment on North Half Moon Drive with Tiffany Jackson and their children. Brown, his cousin, was also there. Bailey was not afraid to hang out with Brown since he was not a gang member.

Bailey drove Brown to the residence where Brown's family lived. Brown needed to pick up some clothes. Brown's father lived on Pacheco Road near Pamela Street. Bailey and Brown were there for five or six minutes.

Bailey testified that when they were at the Brown family's house, he met Andrew Smith for the first time. Smith asked for a ride to get some marijuana. Bailey agreed. Bailey followed Smith's directions and drove Smith and Brown to Eve Street, near Pacheco Road. Brown and Smith got out of the car and Bailey stayed with the vehicle. Bailey testified he had no idea what Smith and Brown were going to do at that location. They were there for six or seven minutes. When Brown and Smith returned to the car, Bailey could smell marijuana on them.

Bailey drove Brown and Smith back to his apartment and parked in the alley, where the garbage cans were. Bailey stayed at his apartment for 10 minutes and then left around 11:40 a.m. to run more errands. Brown and Smith stayed at his apartment.

Bailey testified he returned to his apartment around 2:00 p.m. Tiffany Jackson and Brown were there. Smith was gone. After he returned, Jackson told him the police were in the alley. Brown left the apartment. Bailey admitted that he talked to Tiffany about what to say to the police, and they agreed to give the same false story about their activities that day.

Bailey testified the police arrived a short time later and conducted a parole search. The police asked Bailey where he had been that day, and whether he was a member of the West Side Crips. Bailey told them he wasn't in the gang anymore. Bailey gave a false story about his activities that day because he did not want to get in trouble. Bailey falsely

13.

said he and Tiffany had been near an apartment house on Eve Street because he was looking for car parts.

### *Bailey's arrest*

Bailey testified the police drove him to the school for a lineup, and the victim got out of the patrol car and looked at him. Bailey asked the police if they would take him back home. An officer said the victim had positively identified him as a robbery suspect.

Bailey testified he was taken to the police department, and he saw Brown being escorted into the adjacent holding area. Bailey denied that he tried to talk or yell at Brown while they were in the adjacent holding rooms. He saw the officers remove Brown from his room. At that time, Bailey tried to talk to the officers, and he yelled that he was on the GPS monitor and to check the tracking records because he didn't commit the crime.

## Tiffany Jackson's testimony

Tiffany Jackson testified Bailey and Brown left their apartment to pick up Brown's clothes at his father's house. They returned with Smith; she had never met him before. Bailey left again to run errands. Smith left separately, and Brown stayed at the apartment.

After Bailey returned from his errands, Jackson saw a police officer in the alley with her neighbor. She went outside and asked what was going on. They said that they found someone's safe and important papers in the garbage can. Jackson went back to the apartment and told Bailey and Brown.

Jackson testified that Brown "got hysterical. And he said that, f**k man. I put that – I put it in there. It wasn't nothing in there so I threw it away." Brown also said "that bitch, she burned me on my weed. I gave her money for chronic and she gave me stress. I wanted my money back and she didn't give me my money back, so I took her shit."

14.

Jackson testified that Bailey immediately became upset and hysterical. Brown left the apartment. Bailey and Jackson had a conversation, and the police arrived.

Jackson testified the police asked her about an incident at an apartment house on Pacheco Road, just east of Eve Street. Jackson falsely claimed she went there with Bailey to look for car parts. She lied because they knew the police would not believe anything Bailey said.

Jackson testified that a few days after Bailey was arrested, she went to the apartment complex where the robbery/burglary occurred. She asked the apartment manager if there were any empty units to rent, and whether there had recently been a robbery there. On October 26, 2010, Jackson returned to the apartment complex with several people: Brown's father; a woman who claimed to have purchased methamphetamine from Garcia; the robbery victim; and someone who spoke Spanish. She wanted to clear Bailey's name and did not threaten Garcia. Jackson testified Garcia agreed to speak with them, and she was not afraid of them. Jackson showed Bailey's photograph to Garcia, and Garcia said she "didn't know. He was just black." Jackson testified she knew "for a fact" that Garcia sold marijuana and methamphetamine.[6]

### BROWN'S DEFENSE

Officer Woessner was recalled as a defense witness for Brown. Woessner testified he interviewed Bailey at his apartment. Bailey said he had been at his aunt's apartment on Pacheco Road. Bailey said he walked up to Eve Street because he was looking for car parts. Woessner also testified about hearing Bailey shout at Brown while they were being held in the adjacent interrogation rooms at the police department.

---

[6] The apartment manager testified Garcia and her children had lived in the apartment for several years, no other adults lived there, and the manager never noticed lots of visitors or unusual activity at Garcia's apartment. Aside from Jackson's testimony, there was no evidence that Garcia engaged in any illegal activities.

Karrie Orsburn, the manager of Garcia's apartment complex, testified Tiffany Jackson arrived at her office a few days after the robbery/burglary. She asked if there were empty units and whether there were security cameras in the area.

**Defense expert**

Stanley Mosley, a private investigator hired by Brown, testified as a defense expert on criminal street gangs. Based on a hypothetical, defense counsel asked Mosley to assume that a middle-aged Hispanic woman lived in an apartment with a special needs child and only kept some documents in a safe, and whether she would be a target for a street gang robbery. Mosley testified that person would not be an appropriate target. Gang members would not rob an apartment at random without knowing what was inside, and they would not rob a place where there were security cameras.

**PROCEDURAL HISTORY**

**The charges against Bailey and Brown**

Bailey and Brown were jointly charged with committing the following offenses against Garcia: count I, first degree robbery (Pen. Code, § 212.5, subd. (a));[7] count II, assault with a firearm (§ 245, subd. (a)(2)); count III, first degree burglary (§ 460, subd. (a)); and count IV, unlawful participation in a criminal street gang (§ 182.22, subd. (a)).

As to Bailey and Brown, it was alleged as to count I that they were principals in the offense, and at least one principal personally used a firearm while committing the offense (§ 12022.53, subds. (b), (e)(1)); gang enhancements as to counts I, II and III (§ 186.22, subd. (b)(1)); and they personally used firearms as to counts II and III (§ 12022.5, subd. (a)). As to Brown, it was alleged he was 16 years of age or older when he committed counts I, II, III, and IV (Welf. & Inst. Code, § 707, subds. (b) & (d)(1)).

Bailey was separately charged with count V, unlawful possession of a firearm by a felon (§ 12021, subd. (a)(1)); count VI, receiving stolen property which belonged to

---

[7] All further statutory citations are to the Penal Code unless otherwise indicated.

16.

Garcia (§ 496, subd. (a)); and count VII, being an accessory after the fact to a felony by harboring, concealing or aiding Brown and/or Andrew Smith with the knowledge they had committed offenses against Garcia (§ 32), with gang enhancements alleged as to these counts.

Also as to Bailey, it was alleged in counts II and V, that he was a principal in the offense and at least one principal personally used a firearm during the commission of the offense (§ 12022.53, subds. (b), (e)(1)); and he had two serious felony convictions, two prior strike convictions, and served two prior prison terms.

**Smith's charges and plea agreement**

On October 23, 2010, the felony complaint was filed against Bailey and Brown. On November 23, 2010, a separate felony complaint was filed against Andrew Smith for the burglary and robbery of Garcia. Smith was not in custody and a felony arrest warrant was issued. On January 29, 2011, Smith was arrested.

On February 28, 2011, a separate information was filed charging Smith with first degree robbery, assault with a firearm, and first degree burglary, with gang enhancements, and separately, with unlawful participation in a criminal street gang. The court denied the People's motion to consolidate Bailey and Brown's joint case with Smith's case.

On June 2, 2011, Smith accepted a plea agreement in his separate case, and pleaded no contest to first degree burglary and admitted a gang enhancement, and was sentenced to nine years. The court granted the People's motion to dismiss the other charges and enhancements against Smith.

17.

**The verdicts against Bailey and Brown**

On May 7, 2012, the joint jury trial began for Bailey and Brown. On May 31, 2012, the court granted defendants' motion to dismiss the section 12022.5, subdivision (a) personal use allegations as to counts II and III.[8]

Smith did not testify at the joint trial for or against Bailey and Brown. During closing argument, the prosecutor explained the People's theory: Bailey was the "big homie" with authority over younger gang members. Bailey's GPS tracking data showed that he drove Brown and Smith to the apartment complex on Pacheco Road and Bailey waited in the car. Brown and Smith broke into Garcia's apartment and robbed her; Brown and Smith took the safe back to Bailey's car. The GPS data showed Bailey drove back to his apartment on North Half Moon Drive, and they broke open the safe in the

---

[8] As to count II, assault with a deadly weapon, and count III, burglary, the amended information alleged section 12022.5, subdivision (a) personal use enhancements against both Bailey and Brown. After the prosecution rested, Brown moved to dismiss the personal use enhancements alleged in counts II and III, based on Garcia's inability to determine which suspect held the gun at her head. The prosecutor agreed the section 12022.5 enhancements should be stricken as to both Bailey and Brown. The court then ordered the section 12022.5 personal use enhancements stricken as to both Bailey and Brown, as alleged in counts II and III, because there was insufficient evidence either defendant personally used a weapon.

At the sentencing hearing, however, the court stated that it only dismissed the section 12022.5 enhancements as to Brown, and it should have also dismissed them as to Bailey. The court further stated that the jury found the personal use enhancement true against Bailey as to count III, burglary, and it ordered that allegation dismissed.

The court's statements may have resulted from reading a notation in Bailey's probation report, that the jury found the section 12022.5 enhancement true against Bailey for count III, burglary. However, there is no evidence the jury received any verdict forms to make any findings, or that it found true, any section 12022.5 personal use enhancement against Bailey as to any count in this case. The notation in Bailey's probation report was erroneous, and the verdict forms clarify the jury never found Bailey personally used a weapon in this case.

alley and threw it in the trash.  The prosecutor conceded that Garcia's identification of Bailey as one of the burglars was incorrect.

On June 7, 2012, the jury found Brown and Bailey guilty of count I, robbery, with the section 12022.53, subdivisions (b) and (e)(1) firearm allegations true, that defendants were principals and at least one principal personally used a firearm; count III, burglary; and count IV, participation in a criminal street gang; and found the gang allegations true as to counts I and III.  Bailey and Brown were found not guilty of count II, assault with a firearm on Garcia.

As to Bailey's separate charges, he was found guilty of count VI, receiving Garcia's stolen property; and count VII, accessory after the fact; and the attached gang allegations were found true.  Bailey was found not guilty of count V, possession of a firearm by a felon.  The court found the prior conviction allegations true.

**Sentencing**

As to Bailey, the court denied his motion to dismiss the prior strike convictions. The court sentenced him to 26 years to life for count I, first degree robbery, plus 10 years for the section 12022.53 firearm allegation, and 10 years for the two prior serious felony enhancements, for an aggregate term of 26 years to life plus 20 years.  The court imposed and stayed another 10-year term for the gang enhancement as to count I.

The court imposed and stayed the remaining terms for Bailey as follows:  count III, burglary, 26 years to life plus 10 years for the gang enhancement, and 10 years for the two prior serious felony enhancements; count IV, the substantive gang offense, 25 years to life plus 10 years for the prior serious felony enhancements; count VI, receiving stolen property, 25 years to life plus four years for the gang enhancement; and count VII, accessory after the fact, 25 years to life plus four years for the gang enhancement.

As to Brown, the court sentenced him to the upper term of six years for count I, first degree robbery, plus 10 years for the section 12022.53 firearm allegation, for an

aggregate term of 16 years.  The court imposed and stayed another 10-year term for the gang enhancement as to count I.

The court imposed and stayed the remaining terms for Brown as follows:  Count III, burglary, the upper term of six years plus 10 years for the gang enhancement; count IV, the substantive gang offense, the upper term of three years.

## DISCUSSION

### I.        Admission of documentary exhibit about Smith's prior conviction

As noted above, the prosecution's theory was that Bailey drove Brown and Andrew Smith to Garcia's apartment building.  Bailey waited in his car, and Brown and Smith broke into her apartment and robbed her.  As we have also explained, Smith was separately charged and entered into a plea agreement for the burglary of Garcia's apartment.  The court excluded any reference to Smith's plea agreement in defendants' joint trial.

Bailey contends the court committed prejudicial error when, after all the parties rested, it granted the prosecution's motion to admit all marked exhibits, including exhibit No. 3.  This exhibit consisted of docket entries for the separate criminal proceedings against Smith, which stated that he pleaded no contest to burglary.  Bailey contends that even though the court had granted his pretrial motion to exclude all references to Smith's plea agreement, including exhibit No. 3, the prosecutor improperly moved this exhibit into evidence in violation of Bailey's confrontation and due process rights.

As we will explain, the entirety of the record suggests this exhibit likely was inadvertently admitted into evidence, and that the jury's verdicts were not influenced by these documents.

### A.        Exhibit No. 3

During the pretrial motions in limine, the prosecutor stated he intended to introduce five predicate offenses in support of the gang allegations.  One of the proposed predicate offenses was Andrew Smith's plea agreement in case No. BF134637A, where

20.

he pleaded no contest to first degree burglary of Garcia's apartment and admitted the gang enhancement.

The documents supporting Andrew Smith's conviction were marked as exhibit No. 3, and consisted of 16 pages of docket entries (summarized in the procedural history, *ante*). The docket entries for Smith had a different case number than the case against the defendants. Exhibit No. 3 did not include the actual complaint, information, abstract of judgment, or any transcripts of Smith's preliminary hearing, plea agreement or sentencing. There were no references to Bailey or Brown in the documents. However, one of the docket entries stated that a stay-away order had been imposed between Smith and Garcia.

Bailey's attorney objected to the prosecutor's proposed use of Smith's burglary conviction as a predicate offense. He argued it should be excluded as prejudicial because it was based on the same facts as the charged offenses against Bailey and Brown. The prosecutor replied it was a "common practice" to use the criminal acts of other gang members to establish a defendant's knowledge of his gang's criminal activities.

The court held Smith's burglary conviction was prejudicial and inadmissible under Evidence Code section 352, and could not be used as one of the predicate offenses. The court was concerned the evidence might violate the defendants' confrontation rights in their joint jury trial because the jury could rely on Smith's burglary conviction as evidence of defendants' guilt in this case.

The prosecutor stated he would use another gang crime as one of the predicate offenses. However, the prosecutor advised the court that the gang expert was going to testify to his opinion that Smith was a member of the West Side Crips, and his opinion was partially based on Smith's burglary conviction. Defendants objected.

The court held the prosecutor could introduce limited evidence that Smith was a gang member.

" '[T]he Court anticipates evidence or at least testimony that a person named Andrew Smith was involved in this case and his affiliation or membership with a gang may become relevant. I have no problem with evidence being introduced to support that Andrew Smith is a gang member. And that's fine. [¶] … [¶]

"… To the extent a witness is going to rely on the facts and circumstances in this case to prove Andrew Smith is a gang member, outside [of] being extremely sanitized so as not to confuse the facts in this case with the conviction involving Mr. Smith, that will be allowed, but it has to be extremely sanitized."

The court further ruled:

"The fear the court has is upon proving Mr. Smith is a gang member generally or that a predicate offense necessary to prove the pattern of criminal activity specifically would – that it would rest on the instant facts is – that's the concern for the Court because *I do not want it introduced and presented in such a way to this jury that the facts have already been established to prove those reasons when it is this jury's job to determine the truth of these allegations and then apply the law to the truth as they find them.*

*"That's not going to happen in this case. That, in this court's view, would be bootstrapping and would be an end-around way of presenting evidence in a manner in which would suggest that the evidence has already been proven sufficient, and, therefore, because of that, this jury need not concern itself with the facts presented or the evidence in this case because that determination's already been made. So that won't happen."* (Italics added.)

## B.     Trial references to Andrew Smith

During trial, the prosecutor did not violate the court's limiting order, and the jury never heard about Smith's conviction for burglary of Garcia's apartment or any references to the documents contained in exhibit No. 3.

The jury heard several references to Smith's possible involvement in the offenses committed against Garcia, all of which were properly based on admissible evidence. At the beginning of trial, the court read the information to the jury, including count VII, which separately charged Bailey with being accessory to a felony by harboring,

22.

concealing or aiding Brown and/or Andrew Smith with the knowledge they had committed offenses against Ms. Garcia (§ 32).

In the prosecutor's opening statement, he told the jury that it had heard Andrew Smith's name when the court read the information, but the information was not evidence and they were not supposed to worry about what happened to Smith and why he was not there. In his opening statement, Bailey's attorney disagreed with this assertion and said the jury needed to be concerned about Smith's role in this case.

As set forth above, the jury heard evidence about Brown's second statement to the police, when he said that Smith told him about the money and drugs in the apartment, they broke into the place, and they took the safe.

The prosecution's gang expert testified that Smith was known as "Baby Rags" and he was a member of the West Side Crips. He did not refer to Smith's burglary conviction.

The jury also heard about Smith during Bailey's trial testimony, when he explained that he met Smith for the first time when he drove Brown to his family's residence; that Smith asked for a ride to buy marijuana; that Smith and Brown left the car while Bailey waited for them; and that Bailey did not know what they were going to do. Tiffany Jackson testified that Smith returned to their apartment with Bailey and Brown, and left before she saw the police in the alley.

After the parties rested, Brown's attorney asked for clarification of the court's ruling regarding Smith's involvement in this case. The court explained:

> "What the court ruled in limine was that the present offense as it relates to Andrew Smith and Andrew Smith's involvement and subsequent conviction cannot be used as a predicate offense in this case .…"

## C.    Admission of exhibit No. 3

Bailey's claim of appellate error is based on what happened during the following discussion about the exhibits. Prior to closing arguments, the court asked the prosecutor

which exhibits he wanted to move into evidence. The prosecutor said he wanted to introduce "everything" except the unredacted transcript and recording of the 911 call, and the DVD of the GPS tracking records.

The court asked the defendants if they had any comments. Bailey's attorney asked to look at the exhibits, asked for clarification about the exhibits which the prosecutor said he was going to exclude, and did not otherwise object. Brown's attorney also asked for clarification, and did not raise any objections.

The court granted the prosecution's motion to admit all the marked exhibits. The exhibit list attached to the minute order indicates that exhibit No. 3 was included in the admitted exhibits. As explained above, exhibit No. 3 consisted of the docket entries regarding Andrew Smith's conviction for burglary, which had been marked during pretrial motions.

During the discussion about the exhibits, there were no comments made by the court, the prosecutor, or the defense attorneys about the inclusion of exhibit No. 3 in the admitted exhibits. When the court asked defendants for their comments on the prosecutor's motion, neither Bailey nor Brown objected to the inclusion of exhibit No. 3 in the exhibit list. In their closing arguments, none of the parties discussed any of the documents in exhibit No. 3 or addressed the disposition of the charges against Andrew Smith.

### D. Analysis

Based on this sequence of events, Bailey contends the admission of exhibit No. 3 into evidence was prejudicial and violated his due process and confrontation rights because it allowed the jury to learn that Smith had been convicted of the burglary of Garcia's apartment, contrary to the court's ruling that such evidence was inadmissible. Bailey asserts that since the court excluded exhibit No. 3, the prosecutor committed prejudicial misconduct by moving all the exhibits into evidence, even if he did not act in bad faith. Bailey further argues his defense attorney was prejudicially ineffective for

24.

failing to object to the prosecutor's motion to introduce all the exhibits. Bailey asserts the error is of constitutional dimension and not harmless beyond a reasonable doubt pursuant to *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

We begin with the sequence of Bailey's multiple claims of error. Bailey and Brown objected to the prosecution's pretrial motion to use Smith's burglary conviction as a predicate offense. The court agreed and excluded the evidence. The prosecutor complied with the court's ruling and did not introduce evidence of Smith's burglary conviction during the trial.

After the close of evidence, the prosecutor moved to admit all the marked exhibits, and specifically excluded the unredacted 911 call and the GPS data. Bailey suggests the prosecutor engaged in prejudicial misconduct because he failed to exclude exhibit No. 3 from his motion, even though the court had denied his pretrial motion to admit Smith's burglary conviction as a predicate offense. " ' "A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Bailey asserts the prosecutor's failure to exclude exhibit No. 3 from his motion is indicative of his bad faith and misconduct. "[A] determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Rather, the issue is whether the defendant's right to fair trial was impacted by the prosecutor's conduct. (*People v. Epps* (1981) 122 Cal.App.3d 691, 706.)

However, "[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the

defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)

Even if the prosecutor sought to avoid the court's ruling by the introduction of the exhibits, and the court did not realize that exhibit No. 3 was still a marked exhibit, there was still another opportunity to exclude exhibit No. 3. The court expressly asked both defense attorneys if they had any objections to the prosecutor's motion to admit all the marked exhibits. Both defense attorneys asked for time to review the exhibits. Exhibit No. 3 was still a marked exhibit and on the exhibit list, but Bailey and Brown did not object. If Bailey had objected to the prosecutor's motion, the court would likely have excluded exhibit No. 3. Bailey's failure to object to the admission of exhibit No. 3 waives any claim of error on appeal. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 433–434.)

In the alternative, Bailey asserts his attorney was prejudicially ineffective for failing to object. "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)

"Failure to object rarely constitutes constitutionally ineffective legal representation [citation] ...." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there

simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–1069.)

Bailey asserts his defense attorney had no tactical reason for failing to object to exhibit No. 3, particularly given counsel's vigorous pretrial arguments against the admission of Smith's burglary conviction. However, the record suggests that by the end of the case, his defense attorney might have decided to change his tactics. Bailey and his girlfriend had given numerous accounts of his activities to the police on the day of the burglary/robbery. Later that day, the investigating officers heard Bailey yell at Brown to " 'Tell those officers that I didn't do anything,' " and " 'You know my situation. I can't get another case,' or something similar to that." Shortly after that, Brown told the police that he committed the burglary/robbery with Smith, and did not implicate Bailey. While the prosecutor conceded Garcia incorrectly identified Bailey as one of the burglars, Bailey's defense faced damaging inculpatory evidence from the GPS tracking data, which placed Bailey at Garcia's apartment; Bailey's prior inconsistent statements about his activities; and the complete absence of Smith from the trial.

By the end of the trial, Bailey's attorney may have decided not to object to exhibit No. 3 so the jury might learn that Smith really existed, and he had been charged and convicted of burglary, which bolstered Bailey's trial testimony that Smith was the culprit, and Brown's statement to the police that he broke into the apartment with Smith.

Bailey further argues the jury's receipt of exhibit No. 3 violated his due process rights because of the court's earlier ruling that admission of Smith's burglary conviction would violate defendants' confrontation rights, in violation of *Bruton v. United States* (1968) 391 U.S. 123 and *Crawford v. Washington* (2004) 541 U.S. 36. 'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman* ….' [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error. [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 69–70.)

While Bailey's attorney might have conceivably had a tactical reason not to object to exhibit No. 3, the record strongly suggests the admission of this exhibit was inadvertent by the court and the parties in this case, particularly since none of the parties addressed Smith's burglary conviction in their closing arguments. In any event, the entirety of the verdicts dispels the possibility that the jury learned of Smith's burglary conviction or, more importantly, the jury was influenced by it, and any error is harmless beyond a reasonable doubt.

The prosecution's theory was that Bailey waited in the car, and Brown and Smith broke into Garcia's apartment and robbed her. If the jury looked at the docket entries for exhibit No. 3, they would have seen that Smith had been charged with burglary, robbery, and assault with a deadly weapon, and he was convicted of burglary with the gang enhancement. Smith did not plead or admit to any firearm allegations.[9] If the jury had been influenced by exhibit No. 3, it could have concluded that since Smith was not convicted of a weapons offense, then Brown must have been the suspect who held the gun to the victim's head, consistent with Garcia's account of the robbery.

Instead, the jury found both Bailey and Brown guilty of robbery with the section 12022.53, subdivisions (b) and (e)(1) firearm allegations true, that defendants were principals and at least one principal personally used a firearm. However, defendants were found not guilty of assault with a deadly weapon on Garcia, and Bailey was not guilty of being a felon in possession of a firearm, thus finding that neither Bailey nor Brown were the principals who were armed with a firearm during the robbery. These verdicts were consistent with Garcia's inability to identify which suspect held the gun to

---

[9] The People assert there was nothing in exhibit No. 3 to connect Smith's burglary conviction to this case since the docket entries did not mention either Bailey or Brown. However, Smith was charged with the same offenses as Bailey and Brown – burglary, robbery, assault with a deadly weapon, and the gang charges – and one of the docket entries included an order for Smith to stay away from Garcia.

her head, Brown's statement to the police that Smith was the gunman during the robbery, and the GPS tracking data which showed that Bailey was in the car and not one of the gunmen who broke into Garcia's apartment. The verdicts thus demonstrate that the jury found defendants guilty and the firearm allegations true based on the testimonial evidence and not from the docket entries contained in exhibit No. 3.

## II. <u>Prosecutorial misconduct</u>

Bailey and Brown contend the prosecutor committed prejudicial misconduct during his rebuttal argument by vouching for the strength of the People's case against them when he said:

> "Remember, look at all the evidence. Don't just look at the stuff the attorneys tell you to because we are biased. I am the most biased person in the courtroom. *I'll tell you right now, I believe to the bottom of my feet these guys did it. That's why I am here*." (Italics added.)

Defendants objected and the court immediately admonished the jury to disregard those statements. However, they contend the admonishment was insufficient to cure the alleged due process violation.

The People assert the prosecutor's rebuttal was fair commentary on the defense closing arguments which attacked the prosecutor's ethical duties, and any misconduct was cured by the court's timely admonishment to the jury.

### A. <u>Legal principles</u>

We begin with the well-settled law on prosecutorial misconduct. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

29.

"When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.] Moreover, prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citation.]" (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1202–1203.)

In reviewing claims of misconduct during closing argument, "we must view the statements in the context of the argument as a whole. [Citation.]" (*People v. Cole, supra,* 33 Cal.4th at p. 1203.) " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1195.)

**B. Closing arguments**

Defendants' claims of misconduct are based on the prosecutor's rebuttal argument. The prosecutor later claimed his rebuttal was fair commentary on the defense closing arguments. We thus begin with the defense closing arguments before we turn to defendants' allegations of misconduct.

Bailey's defense counsel (Mr. Moffat), focused on the conflict between Garcia's infield identification of Bailey as one of the robbers, compared to the prosecution's trial theory that Bailey was really the driver, Brown and Smith broke into the apartment, and they robbed Garcia. In light of this inconsistency, defense counsel criticized the prosecutor's "absolute certainty" about "the evidence … in this case that [Bailey] is guilty .…" Bailey's attorney argued that Bailey felt he had no choice but to lie to the police when they initially asked about his activities that day:

"… *Mr. Russell [the prosecutor] can go back to his office, and he has stature; he has a reputation; he has a good job; he's got an excellent salary. He doesn't have to worry in his life about whether anybody believes him or doesn't believe him.* [W]hereas Mr. Bailey comes from an

entirely different way of looking at things. What Mr. Bailey decided back there … when he found out that this strongbox had been found in his trash can, he didn't believe that law enforcement would in any way accept the possibility that he did not know how or what happened over there on Pacheco and Eve Street.…" (Italics added.)

Bailey's attorney argued that "law enforcement" had a "bias" in this case.

"[W]hen officers are testifying in this case, they have a bias. All right? I got a bias. Larry Bailey has a bias. [¶] *But law enforcement has a bias as well.* All right? We all have biases. So when – I mean, when gang officers testify in this case, it is not because they want to necessarily state those things that might be positive for Larry Bailey. Okay? *They are here to do their job, and their job is to convict Larry Bailey.* I am not saying they would lie or whatever. *I am just saying that they have their preference, their bias, just like we all do.*" (Italics added.)

Bailey's attorney argued that the testimony from law enforcement had been "shaped by the fact that they believe [Bailey] is a gangster."

"Law enforcement made that decision a long time ago. Okay? And just as I am saying, we are not here to pity Larry Bailey. At the same time, it is still important that we understand that *law enforcement has a bias, just as we all do, and that bias in this case is, regardless of what the facts are, Larry Bailey is a gangster.*" (Italics added.)

Bailey's attorney also asserted the prosecutor was uncertain of the strength of his case because he was relying on two alternative theories based on the nature of the charged offenses: That Bailey was the getaway driver and guilty as a principal of the robbery, assault, and burglary as charged in counts I, II, and III; or that he was simply an accessory after the fact who was not the getaway driver but helped them get rid of the safe, as charged in count VII.

"[T]here's got to be some question in the People's mind* with regard to the facts of this case if they choose to present a theory whereby [Bailey] is either the robber or he is not the robber. I mean, it does not make sense. This does not match. Okay? But that's how they've chosen to proceed with their case.

"Again, the bottom line is this: *If they cannot decide* what [Bailey's] criminal liability is in this case, then the question is based on the evidence

31.

presented to you, *can you really find without a reasonable doubt that my client is criminally liable in this case*?" (Italics added.)

In Brown's closing argument, his attorney attacked the accuracy of Garcia's identification of Bailey as one of the burglary suspects. Brown's attorney argued that Garcia's incorrect identification of Bailey also undermined her field identification of Brown. He argued the GPS data showed Bailey drove back to the alley where the safe was found, which supported the theory that Bailey knew what happened at Garcia's apartment and knowingly participated in breaking open the safe.

As for Brown's confession to the police, his attorney noted Brown repeatedly denied any involvement in the crime until the officers heard Bailey yell at him in the adjacent holding room. Counsel argued that Brown's confession was not voluntary because he felt threatened by Bailey to implicate himself and shift the blame away from Bailey. Brown's attorney also addressed the timeline of events, and said he "believe[d]" Bowen's testimony that he found the safe in the garbage can much earlier in the day than he later testified about. He criticized the prosecutor for saying that he understood why Tiffany Jackson lied because "[h]e's not representing somebody looking at a conviction."

## C. <u>The prosecutor's rebuttal argument</u>

In rebuttal to the defense arguments, the prosecutor conceded Garcia's identification of Bailey as one of the robbers was incorrect, but argued the GPS evidence showed that Bailey drove Brown and Smith to Garcia's apartment to commit the robbery/burglary, and he waited in the car while they committed the crimes. The prosecutor reviewed the evidence about the GPS tracking data, Bailey's gang status, and the officers' testimony about hearing Bailey shout to Brown at the police department just before Brown confessed. The prosecutor asked the jury to "judge the credibility" of Bailey's trial testimony, in which he denied that he shouted to Brown or that he was a gang member, compared to the evidence from the officers on the same issues.

32.

Defendants' appellate claims of prosecutorial misconduct are based on the prosecutor's very next statement:

> "Remember, look at all the evidence. Don't just look at the stuff the attorneys tell you to because we are biased. I am the most biased person in the courtroom. *I'll tell you right now, I believe to the bottom of my feet these guys did it. That's why I am here*." (Italics added.)

Bailey's attorney immediately objected, and said it was an improper argument and asked for the jury to be admonished. Brown's attorney joined the objection.

The court immediately admonished the jury as follows:

> "Ladies and gentlemen, the attorneys, as I stated previously, are advocates for their side and oftentimes they will make statements or say things during their argument that may be somewhat improper or across [*sic*] the line.

> "At this time, based on [the prosecutor's] last statement, *I am going to order that you disregard his last statement regarding believing from the bottom of his feet*." (Italics added.)

Both defense attorneys asked to address the issue at a later time outside the jury's presence. The court agreed and directed the prosecutor to continue.

The prosecutor continued with rebuttal and made the following comments:

> "[T]here have been statements made that witnesses are biased, law enforcement came in and made stuff up, and specifically *the reference or comment made by [Bailey's attorney] where he said that I cannot decide when I charged this case* between the [accessory after the fact charge] … and the charges involving the robbery, the burglary, and the assault with the gun, and if I can't decide, then neither can you, and that's reasonable doubt because everybody is biased in the case.

> "I am here to tell you that *you are chosen because you are neutral, unbiased jurors who will look at all the evidence as presented*, not just the parts that the participants direct you to look at. Look at all of it.…" (Italics added.)

The prosecutor reviewed the evidence and concluded his rebuttal argument without further objection.

### D. **Postargument objections**

After the conclusion of closing arguments, the jury left the courtroom and Brown's defense attorney moved for a mistrial based on the prosecutor's rebuttal argument:

> "[The prosecutor] told the jury in so many words that he knew and believed these people were guilty. And that is thoroughly poisonous. This jury now has to call him a liar, has to call … has to impugn [the prosecutor] in order to bring back an acquittal. And it was a statement beyond the pale."

In the alternative to a mistrial, Brown's attorney requested to reopen his closing argument and briefly address the jury to cure the prosecutor's misconduct.

Bailey's attorney conceded the prosecutor might have made his rebuttal comments in response to his own closing argument, and requested a recess to research the impact of the prosecutor's misconduct.

The prosecutor replied the law allowed him to respond to the defense attorneys' statements during their closing arguments.

> "There was extensive comment by both [defense] counsel about bias, motive of law enforcement agencies, the bias and the power of the state in prosecuting the defendants, the intent of my office, me in particular, my qualifications as a prosecutor, my abilities as a prosecutor during the time that we were prosecuting this case. And those comments came up specifically in closing arguments by both [defense] counsel."

The prosecutor added that if any of his comments were unwarranted, "the remedy for most everything is as was done, objections by both counsel, sustained objections by the Court, admonishments to the jury and admonishments to myself."

After a recess, Brown filed a formal motion for mistrial, and argued the harm caused by the prosecutor's misconduct was so prejudicial that it could not be cured by any type of admonishment. Bailey joined Brown's argument.

34.

## E. **The court's ruling**

The court denied defendants' motions for mistrial and made extensive findings based on the entirety of the trial and all the closing arguments. The court noted that defendants objected to the prosecutor's statement that he believed the defendants were guilty.

The court further noted that both defense attorneys used similar phrases about their "belief" whether witnesses were being truthful: Bailey's attorney said he did not believe Tiffany Jackson's testimony, and Brown's attorney said he did not believe some aspects of Bowen's testimony about what time he found the safe in the garbage can.

The court turned to the first part of the prosecutor's rebuttal argument, about biases:

> "It does appear to the Court that a number of phrases have been utilized during closing arguments by all sides, including the word 'bias' as it related to Tiffany Jackson, Jacqueline Garcia, the confession, and law enforcement. To the extent that it's [*sic*] been argued these persons have a reason to not tell the truth or at least have an underlying bias to direct their testimony, the point has certainly been made to the jury.

> "Insofar as and in line with those particular attacks to law enforcement generally as they may have and, in fact, have been commented on having biases of some sort, to the extent that it would be detrimental to the defense, it appears that [the prosecutor], as a representative of the People, ostensibly from the District Attorney's Office, was commenting on a bias that he may likewise have to the extent that most would lump [the prosecutor] in with law enforcement. *Insofar as that is concerned, that is of a less concern to the Court insofar as how this jury would interpret that particular phrase and argument to them when presented by [the prosecutor]*." (Italics added.)

The court then turned to the prosecutor's second phrase, which it found was "somewhat different" and "more testimonial in this Court's view insofar as the comment, quote, I believe to the bottom of my feet these guys did it, end quote."

> "In considering that phrase in isolation, it might appear, as the defense proposes, that it is completely misconduct by the prosecutor

35.

*because the prosecutor is lending his own personal beliefs to what this jury should do in how this jury should decide this case. One phrase in isolation, that certainly is a reasonable interpretation.*

"However, the Court, in considering [the prosecutor's] rebuttal argument, which occurred and began approximately eight minutes before that, as well as his closing argument initially given …, [it] does appear to the Court, in addition to his comments made directly after that statement, *that he was going through yesterday quite effectively the evidence presented in this case, including witnesses['] testimony, as well as physical evidence insofar as photographs and GPS information.*

"[The prosecutor] began his rebuttal argument going directly toward rebutting comments made by defense counsel to the extent evidence would deal and be contrary to their comments to the jury and began, after the jury was admonished, with an analysis of the evidence to the extent that it was supporting his opinion that the defendants did it." (Italics added.)

The court concluded the prosecutor's misconduct "in isolation" was addressed by its admonition:

"In that regard, the Court does find that that statement in isolation was misconduct, and, however, viewed in the totality, while it is still misconduct, the Court does feel that the appropriate remedy in this case would be an admonition to the jury.

"If this Court recalls correctly, upon making the completion of that phrase previously stated, both defense counsel objected, [the prosecutor] stopped his argument, I sustained the objection, and I admonished the jury not to consider that statement made, and then I paraphrased that particular statement. *Upon doing so and making contact with the jury, I did get nods and so forth indicating that they did understand the admonition, and [the prosecutor] proceeded to complete his rebuttal argument.*

"To the extent that anything else needs to be done for this jury, the Court finds that the admonition previously given is sufficient to address this particular issue and finds that no further action is necessary." (Italics added.)

**F.  Analysis**

Bailey and Brown argue that the prosecutor's rebuttal argument constituted prejudicial misconduct because he vouched for the strength of the People's case, and it was impossible to cure the misconduct with any type of admonition.

"A prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record.  [Citations.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 958.)  "It is misconduct for prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.'  [Citation.]  Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.'  [Citation.]  The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.'  [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

However, "[p]rosecutorial assurances, *based on the record*, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts *outside* the record.  [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 757, italics in original.)  Thus, it is not misconduct "to ask the jury to believe the prosecution's version of events as drawn from the evidence.…  It is not misconduct for a party to make explicit what is implicit in every closing argument .…" (*People v. Huggins* (2006) 38 Cal.4th 175, 207.)

In this case, the prosecutor did not commit misconduct during the entirety of his rebuttal argument as he addressed the defendants' attack upon the evidence.  The prosecutor sought to respond to the remarks by Bailey's defense attorney, who attacked the collective "bias" of law enforcement and the prosecutor in bringing the case against

37.

Bailey. The prosecutor also responded to the assertions by both defense attorneys, that certain witnesses could not be believed because of various inconsistencies. In doing so, however, the prosecutor relied on the evidence which refuted the defendants' version of events and summarized the evidence in support of the People's case, particularly the GPS tracking data of Bailey's movements, the gang evidence about both defendants, and the officers' testimony about hearing Bailey shout to Brown at the police department just before Brown confessed and implicated Smith instead of Bailey. The prosecutor asked the jury to "judge the credibility" of Bailey's trial testimony, in which he tried to explain his numerous inconsistent statements and denied that he shouted to Brown or that he was a gang member, compared to the evidence from the officers on the same issues.

As noted by the court, the prosecutor's comments about believing "to the bottom of my feet these guys did it[,]" taken in isolation, appeared to amount to impermissible vouching. But as the court also noted, this brief remark was made in the midst of the prosecutor's summation of evidence in support of the People's case. In the context of the prosecutor's rebuttal argument, there was no inference that he was vouching for evidence which had not been introduced at the trial.

Defendants assert the prosecutor's stated belief in defendants' guilt constituted prejudicial misconduct which could not have been cured by an admonition. They rely on *People v. Alvarado* (2006) 141 Cal.App.4th 1577 (*Alvarado*), where the court found the prosecutor committed misconduct by arguing:

> " 'I have a duty and I have taken an oath as a deputy District Attorney not to prosecute a case if I have any doubt that that crime occurred. [¶] The defendant charged is the person who did it.' " (*Id*. at p. 1583, italics omitted.)

*Alvarado* held the prosecutor had "impermissibly invited the jury to convict [the defendant] based on her opinion that he was guilty and on the prestige of her office …." (*Id*. at pp. 1584–1585.) The impermissible inferences from the prosecutor's comments were that "(1) the prosecutor would not have charged [the defendant] unless he was

38.

guilty, (2) the jury should rely on the prosecutor's opinion and therefore convict him, and (3) the jurors should believe [the witness] for the same reason." (*Id*. at p. 1585.) *Alvarado* held an admonishment would not have cured the harm because the evidence against the defendant was not overwhelming, and the prosecutor suggested more than once that she had additional evidence of his guilt that had not been presented. (*Id*. at p. 1586.)

A contrary conclusion was reached in *People v. Sully* (1991) 53 Cal.3d 1195 (*Sully*), where the defendant also claimed the prosecutor vouched for the credibility of the People's case and certain witnesses. *Sully* rejected these claims of misconduct:

> "Considered in context, almost all of the examples cited amounted to argument from facts in the record directed to the credibility of witnesses, not the personal statement of the prosecutor vouching for their credibility. Such argument is proper; no misconduct occurred. [Citation.] *The one personalized reference – a remark that the prosecutor had not deceived the jury and would not lie to it – was brief, innocuous, and followed immediately by references to evidence bearing on witness credibility. There was no conceivable prejudice to defendant in the remark.*" (*Id*. at pp. 1235–1236, italics added.)

In *People v. Lopez* (2008) 42 Cal.4th 960 (*Lopez*), the defendant argued the prosecutor improperly vouched for the People's case during rebuttal when she said: " 'I don't think [defense counsel] is mean or stupid. *But I think his client is guilty*.' " (*Id*. at p. 971, italics added in original.) *Lopez* rejected the defendant's claim of prejudicial misconduct:

> "[T]he prosecutor's comment did not imply that she based her belief in defendant's guilt on evidence not presented at trial. To the contrary: Because her statement that she believed defendant was guilty *immediately followed her comment that, in her view, defense counsel's cross-examination of the victims demonstrated that they were credible*, a reasonable juror would most likely infer that the prosecutor based her belief in defendant's guilt on the credibility of the victims' testimony at trial." (*Ibid*., italics added.)

39.

As in *Sully*, we find the prosecutor's rebuttal remark in this case about his belief in the People's case was also brief and innocuous. As in *Lopez*, the prosecutor's statement was made in the midst of his summation of evidence which supported the People's case and refuted the defense theories. More importantly, the prosecutor's statement was immediately followed by the court's express admonishment for the jury to disregard the prosecutor's statement of belief. Indeed, the court made the factual finding that when it admonished the jury, "I did get nods and so forth indicating that they did understand the admonition." Given the court's findings, we presume the jury followed the court's immediate admonishment which cured any possible misconduct. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Finally, even if the rebuttal argument was considered misconduct, the entirety of the record refutes any possibility that the jury was influenced by the prosecutor's purported vouching for the strength of the People's case. The jury did not return blanket guilty verdicts against the defendants. Instead, the jury found Bailey and Brown not guilty of assault with a deadly weapon on Garcia, and found Bailey not guilty of being a felon in possession of a firearm. These findings indicate the jury returned the verdicts based on its evaluation of the evidence and not because the prosecutor declared his belief in the defendants' guilt.

## III.    CALCRIM No. 301

Bailey argues the court improperly instructed the jury with CALCRIM No. 301, that it could not rely on Bailey's trial testimony to acquit him unless it found supporting corroborative evidence. Bailey argues the court should have clarified CALCRIM No. 301 to explain that Bailey could exonerate himself with his trial testimony, and certain cautionary language only applied if Bailey was determined to be an accomplice and he implicated Brown in the burglary/robbery. Bailey's argument is meritless given the entirety of the instructions.

## A. **Failure to object**

" 'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)

Defendant contends CALCRIM No. 301 should have been modified in certain aspects. Defendant asserts that he has not forfeited review of this issue because the alleged instructional errors affected his substantial rights. In the alternative, he claims that his defense attorney's failure to object to these issues constitutes prejudicial ineffective assistance.

Defendant is correct that an instructional error that affects defendant's substantial rights may be reviewed on appeal despite the absence of an objection. (§ 1259; *People v. Prieto* (2003) 30 Cal.4th 226, 247.) We will therefore address the merits of his instructional challenge. "[I]n reviewing an ambiguous instruction …, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. [Citation.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. omitted.)

## B. **Accomplice instructions**

The instruction at issue in this case is CALCRIM No. 301, testimony of a single witness. The pattern instruction states:

> "[Except for the testimony of *<insert witness's name>*, which requires supporting evidence [if you decide (he/she) is an accomplice],] (the/The) testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

41.

The court has a sua sponte duty to give this instruction. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884–885.) The court should insert the first bracketed language if the testimony of an accomplice or other witness requires corroboration. (*People v. Chavez* (1985) 39 Cal.3d 823, 831.)

The court also has a sua sponte duty to give CALRIM No. 334, the cautionary instructions about accomplice testimony, including the need for corroboration, when there is sufficient evidence that a witness was an accomplice. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.)

C. **Analysis**

In this case, the jury received the following version of CALCRIM No. 301:

> "*Except for the testimony of Larry Bailey, which requires supporting evidence*, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

Defendant did not object to this instruction. He now contends that the italicized phrase was legally incorrect and likely led the jury to believe that it could not believe Bailey's trial testimony about his innocence in the absence of supporting evidence.

Bailey complains the court omitted the second part of the bracketed phrase in the pattern version of CALCRIM No. 301, which would have modified the instruction to read: "*Except for the testimony of Larry Bailey, which requires supporting evidence* [if you decide he is an accomplice] …." The record is silent as to why the court did not include this bracketed phrase, and Bailey did not object to the instruction or request modification.

In any event, the omission of this bracketed language was not prejudicial given the entirety of the instructions because the jury also received CALCRIM No. 334, which clarified CALCRIM No. 301's cautionary language about Bailey's trial testimony:

> "*Before you may consider the statement or testimony of Larry Bailey as evidence against Rayshaun Brown, you must decide whether Larry*

42.

*Bailey was an accomplice to those crimes*. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if, one, he or she personally committed the crime or, two, he or she knew of the criminal purpose of the person who committed the crime; and, three, he or she intended to and did, in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime. [¶] The burden is on the defendant to prove that it is more likely than not that Larry Bailey was an accomplice." (Italics added.)

CALCRIM No. 334 defined an accomplice and further stated:

"If you decide that a declarant or witness was an accomplice, then *you may not convict Defendant Brown based on Defendant Bailey's statement or testimony alone*. You may use the statement or testimony of an accomplice to convict the defendant only if, one, the accomplice's statement or testimony is supported by other evidence that you believe; two, that supporting evidence is independent of the accomplice's statement or testimony; and, three, that supporting evidence tends to connect the defendant to the commission of the crimes." (Italics added.)

CALCRIM No. 334 concluded with definitions of supporting evidence, and to view incriminating statements with caution.

Based on the entirety of the instructions, no reasonable jury would have so narrowly interpreted CALCRIM No. 301 as suggested by Bailey, particularly given the clarifying language of CALCRIM No. 334. We thus conclude that the omission of the bracketed language in CALCRIM No. 301 was harmless under any standard given CALCRIM No. 304's clarification of the cautionary language contained in CALCRIM No. 301.

## IV.    Failure to instruct on lesser included offense

Bailey contends the court erroneously denied his motion to instruct the jury on theft as a lesser included offense of count I, robbery of Garcia. Bailey argues the instructional error was prejudicial because the lesser offense was supported by substantial evidence and Garcia could not identify which suspect held the gun at her head.

43.

## A. **Background**

Bailey and Brown were both charged with count I, robbery of Garcia. After the parties rested, defendants requested instructions on grand or petty theft as lesser included offenses to robbery.

The court denied defendants' motion for any lesser included offenses. The court considered grand theft because it was closely related to robbery, but decided that the offense did not "factually fit with the evidence that's been presented in this case." The court further explained:

> "[W]hile petty theft and grand theft are lesser included offenses, it is this court's position that the evidence presented in this case is sufficient to sustain a conviction for robbery given the circumstances as testified to by the alleged victim, as well as comments that have been presented from Mr. Brown during the investigation.

> "For those reasons, the Court feels there's been sufficient evidence to support a conviction of robbery, and because of that, will not give a lesser included offense to Count 1."

Bailey and Brown were convicted of robbery.

## B. **Robbery and theft**

"A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citation.] This sua sponte obligation extends to lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. [Citations.]' [Citations.] As we stated recently, 'A criminal defendant is entitled to an instruction on a lesser included offense only if [citation] "there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser.* [Citations.]' [Citation.]" (*People v. Lopez* (1998) 19 Cal.4th 282, 287–288, italics in original.)

Robbery is the "felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accompanied by means of force or fear." (§ 211.) "Robbery is essentially larceny aggravated by use of force or fear to facilitate the taking of property from the person or presence of the possessor. [Citation.]" (*In re Albert A.* (1996) 47 Cal.App.4th 1004, 1007–1008.)

"Generally, 'the force by means of which robbery may be committed is either actual or constructive. The former includes all violence inflicted directly on the persons robbed; the latter encompasses all … means by which the person robbed is put in fear sufficient to suspend the free exercise of … will or prevent resistance to the taking.' [Citation.] This 'constructive force' means 'force, not actual or direct, exerted upon the person robbed, by operating upon [a] fear of injury ….' [Citation.] … Included within the common meaning of 'force' is 'such *threat* or *display* of physical aggression toward a person as *reasonably inspires fear* of pain, bodily harm, or death.' [Citation.]" (*People v. Wright* (1996) 52 Cal.App.4th 203, 210–211, italics added in original.)

The force required for robbery is more than "just that quantum of force which is necessary to accomplish the mere seizing of the property." (*People v. Morales* (1975) 49 Cal.App.3d 134, 139.) However, the degree of force used " ' "is immaterial. All the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance … [citations]." ' " (*People v. Jones* (1992) 2 Cal.App.4th 867, 870.)

" '[F]orce' is not an element of robbery independent of 'fear'; there is an equivalency between the two. ' "[T]he coercive effect of fear induced by threats … is in itself a form of force, so that either factor may normally be considered as attended by the other." ' [Citation.]" (*People v. Wright*, *supra*, 52 Cal.App.4th at p. 211.) "To establish a robbery was committed by means of fear, the prosecution 'must present evidence "… that the victim was in fact afraid, and that such fear allowed the crime to be accomplished." ' [Citations.]" (*People v. Morehead* (2011) 191 Cal.App.4th 765, 772.)

" 'The element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his property.' [Citations.]" (*Id.* at p. 775.)

It is settled that the crime of theft, whether divided by degree into grand theft or petty theft, is a lesser included offense of robbery. (*People v. Ortega* (1998) 19 Cal.4th 686, 694–697.) "Where the elements of force or fear are absent, a taking from the person is grand theft, a lesser included offense of robbery. [Citations.]" (*People v. Jones*, *supra*, 2 Cal.App.4th at p. 869.)

Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is 'evidence from which a jury composed of reasonable [persons] could … conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

C. **Analysis**

The primary evidence about the actual robbery was based on Garcia's trial testimony and pretrial statements. Garcia described a harrowing scene as the two suspects surprised her while she was in her bedroom. The gunman placed his hand over her eyes and mouth, put the gun to her head, and pushed her to the floor. The gunman took her around the apartment as the two suspects ransacked the rooms and looked for something. Garcia testified the gunman continued to hold the gun to her head. After the second suspect found the safe, the gunman again forced her to the floor. He pulled back the slide and chambered a round in his gun, and she heard a metallic sound and waited to be shot. Fortunately, the two suspects left without firing. The officers later found a live Lugar bullet on the floor where she had been pushed down.

In his second statement to the officers, Brown admitted he entered the apartment but implicated Smith as the instigator, driver, and gunman. Brown said Smith pointed the gun at the victim. Bailey repeatedly denied any involvement in the burglary/robbery, and insisted he did not know what Brown and Smith were going to do when they got out of his car.

The trial court properly denied Bailey's request for theft instructions as lesser included offenses because there was no contrary evidence the offense was anything other than a robbery accomplished by means of force or fear. The gunman's conduct of placing a gun to Garcia's head, covering her face, keeping the gun at her head as they searched the apartment, and chambering a round just as the suspects left, were reasonably calculated to intimidate and frighten Garcia, who believed she was going to be shot.

The element of fear was proven, and no instruction on "mere theft" was warranted. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1320.) While Garcia may not have suffered actual physical injuries, "the inference that force was used is compelling. The degree of force is immaterial. [Citations.] There was no contradictory version of the evidence to support instruction on the lesser offense of grand theft from the person." (*People v. Jones*, *supra*, 2 Cal.App.4th at p. 871.)

Bailey asserts the lesser included instructions on theft should have been given because there was a "scenario" where he may have been part of "an intended burglary to accomplish marijuana trafficking but [he had] no knowledge of a plan to commit a robbery," and this scenario was "plausible" based on his trial testimony. Bailey speculated that he might have thought Smith and Brown were just going to steal drugs during the narcotics transactions in the apartment. This theory was completely unsupported by the evidence. At trial, Bailey testified Smith asked him for a ride so he could get some marijuana, he followed Smith's directions to the apartment complex, Smith and Brown got out of his car, Bailey waited in the car, and Bailey had no idea what

47.

Smith and Brown were going to do at that location. There was no evidence to support the scenario which Bailey presents on appeal.

## V. <u>**Bailey was convicted of first degree robbery**</u>

Bailey contends his conviction for count I, first degree robbery, must be reduced to second degree robbery because the jury failed to specify the degree on the verdict form. As we will explain, this argument is refuted by the entirety of the record.

### A. <u>**Background**</u>

Section 212.5 defines the offense of robbery and states in pertinent part:

> "(a) Every robbery … *which is perpetrated in an inhabited dwelling house … is robbery of the first degree.*

> "(b) Every robbery of any person while using an automated teller machine or immediately after the person has used an automated teller machine and is in the vicinity of the automated teller machine is robbery of the first degree.

> "(c) *All kinds of robbery other than those listed in subdivisions (a) and (b) are of the second degree.*" (Italics added)

The amended information alleged Bailey and Brown committed count I, robbery, as follows:

> "[They] did willfully, unlawfully and by means of force or fear take personal property from the person, possession [or] immediate presence of Jacquelina Garcia, *and said offense was perpetrated in an inhabited dwelling house …* in violation of Penal Code *section 212.5(A),* a felony." (Italics added.)

There was overwhelming evidence at trial that the robbery was committed in the apartment where Garcia lived.

The jury was instructed as to count I, robbery, that the offense was divided into two degrees:

> "Robbery is divided into two degrees. If you conclude that the defendant committed a robbery, you must then decide the degree.

48.

"To prove that the defendant is guilty of first degree robbery, the People must prove that:

"*The robbery was committed in an inhabited dwelling*. A dwelling is inhabited if someone lives there and either is present or has left but intends to return.

"All other robberies are of the second degree.

"The People have the burden of proving beyond a reasonable doubt that the robbery was first degree rather than a lesser crime. *If the People have not met this burden, you must find the defendant not guilty of first degree robbery*." (CALCRIM No. 1602, italics added.)

For count I, the jury received a single verdict form which gave the following two options on the same page.

"We, the jury, empanelled to try the above entitled cause, find the defendant, LARRY BAILEY-BANKS JR, guilty of Felony, to wit: *Robbery, in violation of Section 212.5(a) of the Penal Code, as charged in the first count of the Amended Information*.

"We, the jury, empanelled to try the above entitled cause, find the defendant, LARRY BAILEY-BANKS JR, not guilty of Felony, to wit: Robbery, in violation of Section 212.5(a) of the Penal Code, as charged in the first count of the amended information."

In returning the verdict, the foreperson signed the first option, that the jury found Bailey guilty of "Robbery, in violation of Section 212.5(a) … as charged in the first count of the Amended Information."

## B. *McDonald-Beamon*

Bailey contends that while the jury found him guilty of count I, it never made a finding that his conviction was for first degree burglary of an inhabited dwelling, and the offense must be reduced to second degree burglary as a matter of law.

Bailey's argument is based on section 1157, which states:

"Whenever a defendant is convicted of a crime or attempt to commit a crime *which is distinguished into degrees*, the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. *Upon the failure of the jury or the court to so*

49.

*determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree.*" (Italics added.)

Section 1192 is a companion statute, and states a similar rule in cases of guilty pleas or bench trials:

"Upon a plea of guilty, or upon conviction by the court without a jury, of a crime or attempted crime distinguished or divided into degrees, the court must, before passing sentence, determine the degree. Upon the failure of the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

Bailey's argument is also based on the interpretation of section 1157 by *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*) and *People v. Beamon* (1973) 8 Cal.3d 625 (*Beamon*). "Under the *McDonald-Beamon* rule, a jury in a criminal case is required to determine the degree of the crime and if it does not, the offense is deemed to be of the lesser degree. [Citations.]" (*In re Birdwell* (1996) 50 Cal.App.4th 926, 928.) "Even if it is obvious that the jury intended to find [the greater degree], the *McDonald-Beamon* rule focuses solely on *the actual verdict* and does not take into account *any extrinsic evidence* or findings. [Citations.]" (*Id.* at p. 930, italics added.)

In *McDonald*, the defendant was charged with murder "in the usual manner, i.e., without specification of degree." He was convicted of murder "as charged in the information," and the jury found the robbery special circumstance true. (*McDonald*, *supra*, 37 Cal.3d at pp. 379, 381.) The defendant argued the verdict should be fixed at second degree murder pursuant to section 1157 because the jury failed to specify the degree in its verdict. *McDonald* agreed: "[T]he key is not whether the 'true intent' of the jury can be gleaned from circumstances outside the verdict form itself; instead, application of [section 1157] turns only on *whether the jury specified the degree in the verdict form.*" (*McDonald, supra,* at p. 382, italics added, overruled in part by *People v. Mendoza* (2000) 23 Cal.4th 896 (*Mendoza*); *Beamon, supra,* 8 Cal.3d at p. 629, fn. 2.)

However, there have been limitations placed on the *McDonald-Beamon* rule. Where the verdict includes language equivalent to "first degree," the degree of the crime has been sufficiently specified. (*People v. Preciado* (1991) 233 Cal.App.3d 1244, 1250 (*Preciado*).) In *Preciado*, the information charged the defendant with a " 'violation of Section 459/460.1/461.1 of the Penal Code (Residential Burglary-*1st Degree*).' " (*Id.* at p. 1247, italics added in original.) The verdict form stated the jury found the defendant guilty " 'of the crime of felony, to wit: Violation of Section 459 of the Penal Code of the State of California, (Residential Burglary) *as charged in Count 1 of the Information*.' " (*Ibid.*, italics added in original.)

*Preciado* held section 1157 did not require reduction of the offense to second degree burglary even though the verdict form did not state whether the jury found him guilty of first or second degree burglary:

> "The verdict described a first degree burglary in so many words, 'residential burglary,' and referred to the information which *did* specifically charge defendant with first degree burglary. There was *no* evidence defendant burglarized anything but an 'inhabited dwelling house' [citation]. And 'residence' and 'inhabited dwelling house' are interchangeable terms. [Citation.]" (*Preciado, supra,* 233 Cal.App.3d at pp. 1247–1248, italics in original.)

*Preciado* distinguished the *McDonald-Beamon* line of cases: "[A]pplication of the rule of *McDonald-Beamon* has been confined to those situations in which the prosecution was forced to argue from inferences *based on collateral findings* in circumstances where no fixing of the degree or the equivalent was made at all." (*Preciado*, *supra*, 233 Cal.App.3d at p. 1248, italics added, fn. omitted.) In contrast, *Preciado* held the case involved a situation "where the offense is unmistakably described as a crime that could only be of the first degree." (*Id.* at p. 1249.)

> "[W]e agree that *McDonald* and *Beamon* are inapplicable because 'in those cases the [intended] degree of the crime was [only] implied by other subsequent findings,' the purpose of which ' "was other than to describe the degree of the crime." ' [Citation.] And such is not the case here. We are

51.

required to imply nothing. The information charged first degree residential burglary; the evidence would only support first degree burglary; and the verdict form, specifically finding burglary of a residence, was just another way of saying first degree burglary. There is no reason to reduce the degree under these circumstances." (*Id.* at pp. 1249–1250, fn. omitted.)

Another example of the *McDonald-Beamon* rule was examined in *People v. Bonillas* (1989) 48 Cal.3d 757 (*Bonillas*). The defendant was charged with murder in violation of section 187, and also with burglary and the special circumstance of murder during a burglary. "[T]he jury was instructed that if it found defendant guilty of murder it was required to find the degree of the murder. However, for some unknown reason it was not furnished a verdict form by which to specify the degree, and the guilty verdict it did return … specified only that defendant was guilty of murder 'as charged in the information.' Because the instructions required the jury to specify the degree of the murder and the verdict returned failed to do so, the verdict was incomplete under the law and the instructions. [Citations.]" (*Id*. at p. 769, fn.omitted.) *Bonillas* cited to *McDonald-Beamon* and further explained:

> "The jury was instructed it should return a finding on the burglary-murder special circumstance only if it found defendant guilty of first degree murder, and, of course, it did return a verdict of true as to the burglary-murder special circumstance. While this would plainly indicate the jury did in fact conclude the murder was first degree, the decisions of this court have insisted on an express finding of the degree to satisfy section 1157, no matter how plain the implied finding. [Citations.]" (*Bonillas*, *supra*, 48 Cal.3d at p. 769, fn. 4.)

However, *Bonillas*'s procedural history did not end with the verdict. The jury had only been excused for the guilt phase, and it was due to return for the penalty phase. The court learned of the verdict defect before the penalty phase began. The court recalled the jury before the penalty phase, and instructed it to resume deliberations and determine the degree of murder. The jury quickly found the murder was of the first degree. On appeal, the defendant argued the original verdict was for second degree murder under section 1157 and *McDonald-Beamon*. *Bonillas* held the court's decision to resume deliberations

did not violate the defendant's due process rights: "Clearly, the jury here remained within the court's control [citations], their verdict was incomplete, and the court was authorized to reconvene the jury to complete its verdict." (*Bonillas*, *supra*, 48 Cal.3d at p. 773.)

In *Mendoza, supra,* 23 Cal.4th 896, the court disapproved of *McDonald-Beamon* in certain circumstances. The indictment alleged the defendants committed murder while committing robbery and burglary. The prosecution's only theory was that the defendants killed the victim while committing robbery and burglary, and the court instructed only on that theory, stating the defendants could be convicted only if the killing occurred during the commission of robbery or burglary, and the defendants had the specific intent to commit robbery or burglary. Neither the instructions nor the verdict forms gave the jurors the option to return verdicts for second degree murder or any lesser form of criminal homicide. The verdicts stated that the defendants were "guilty of the offense charged in Count I, a felony, to wit, murder in violation of Section 187(a)," and that the murder was committed while the defendants were engaged in the commission of robbery and burglary. (*Id.* at pp. 903, 907.)

*Mendoza* rejected the defendants' argument that their convictions should be reduced from first to second degree murder, and held section 1157 was inapplicable because the defendants had not been convicted of a crime which was " 'distinguished into degrees.' " (*Mendoza, supra,* 23 Cal.4th at p. 910, fn. omitted.) "[T]he prosecution's only murder theory at trial" was felony murder, "which is first degree murder as a matter of law [citation]," and the jury was instructed "to return either an acquittal or a conviction of first degree murder." (*Id.* at p. 900.) The court reasoned that "the first degree felony-murder rule 'is a creature of statute,' " which, by its terms, makes murder committed during robbery or burglary murder of the first degree. (*Id.* at p. 908.) "Thus, there are no degrees of such murders; as a matter of law, a conviction for a killing committed during a robbery or burglary can *only* be a conviction for first degree murder." (*Ibid.,* italics in

53.

original.)  Consequently, in such a case "the *only* guilty verdict a jury may return is first degree murder.  [Citations.]"  (*Ibid.*, italics in original.)

*Mendoza* held "that under these circumstances, section 1157 did not apply because [the defendants were not] 'convicted of a crime ... which is distinguished into degrees' within the meaning of that section."  (*Mendoza*, *supra*, 23 Cal.4th at p. 900.)  The court stressed that where a jury is instructed solely "on first degree felony murder and to find the defendant either not guilty or guilty of first degree murder," "the *only* crime of which a defendant may be convicted is first degree murder, and the question of degree is not before the jury."  (*Id.* at p. 910.)  In explaining its rationale, the court articulated the purpose of the degree-fixing statute "is to ensure that where a verdict *other than first degree is permissible,* the jury's determination of degree is clear."  (*Ibid.,* italics in original.)  But where a factfinder can *only* convict a defendant of a first degree crime, to require a reviewing court to deem the conviction to be of a lesser crime "that was never at issue" would produce "absurd and unjust result[s]" and elevate form over substance.  (*Id.* at p. 911.)

*Mendoza* partially overruled *McDonald*, which had mandated that " 'the terms of the [degree-fixing statute were] unambiguous' " and were to be strictly applied without exception.  (*Mendoza, supra,* 23 Cal.4th at p. 913.)  In overruling *McDonald, Mendoza* was "mindful that [the] Courts of Appeal have been critical of *McDonald* and have adhered to it only grudgingly."  (*Mendoza, supra,* 23 Cal.4th at p. 923.)

In *Sanchez v. Superior Court* (2002) 102 Cal.App.4th 1266 (*Sanchez*), a defendant charged with first degree murder sought a writ "to compel the trial court to accept his guilty plea to murder without specifying its degree and to conduct a hearing under section 1192 [the degree-fixing statute] to determine the degree of the murder."  (*Id*. at p. 1268.)  In denying the writ, *Sanchez* applied *Mendoza's* rationale to conclude that "[w]hen the language of the charge can only be first degree murder, an accusatory pleading does not charge a crime 'distinguished or divided into degrees' and, therefore, [the degree-fixing

54.

statute] does not apply." (*Sanchez, supra,* 102 Cal.App.4th at pp. 1269–1270.) *Sanchez* relied on *Mendoza* and further held: "[The degree-fixing statute] was enacted to assure certainty in the degree of a conviction prior to sentencing. [Citation.] It was not intended to apply *where neither logic nor the accusatory pleading leave any doubt as to the degree of the murder charged.*" (*Sanchez, supra,* 102 Cal.App.4th at p. 1273, italics added.)

## C. Analysis

There was no question from the trial evidence in this case that the robbery occurred in an inhabited dwelling house. However, section 1157 and the *McDonald-Beamon* rule focuses on whether the jury failed to specify the degree of the crime in the actual verdict form, and not on circumstances outside the verdict form itself. (*McDonald, supra,* 37 Cal.3d at p. 382.)

Nevertheless, the instant case is very similar to the circumstances in *Preciado* and *Mendoza* because the verdict form for count I included language equivalent to "first degree robbery," and the jury only had the choice to find defendant guilty or not guilty of first degree robbery. As explained above, the amended information charged in count I that Bailey "did willfully, unlawfully and by means of force or fear take personal property from the person, possession [or] immediate presence of Jaquelina Garcia, *and said offense was perpetrated in an inhabited dwelling house* … in violation of Penal Code section 212.5(A), a felony." (Italics added.) Section 212.5, subdivision (a) defines the offense of first degree robbery of an inhabited dwelling house.

The instructions further defined first degree robbery as charged in count I as a robbery which occurs in an inhabited dwelling house, that all other robberies were second degree, and the People had the burden of proving the robbery "was first degree rather than a lesser crime. *If the People have not met this burden, you must find the defendant not guilty of first degree robbery.*" (CALCRIM No. 1602, italics added.)

While the instructions defined all other robberies as second degree, the verdict form gave the jury only one choice: Both defendants were either guilty or not guilty in

55.

count I of a "[f]elony, to wit: *Robbery, in violation of Section 212.5(a) of the Penal Code, as charged in the first count of the Amended Information.*" The jury did not have an option to convict defendant of anything less that first degree robbery. The jury was instructed that the People had the burden of proving the crime was first degree robbery of an inhabited dwelling. If, for some reason, the jury determined that the prosecution failed to prove the robbery occurred in an inhabited dwelling, the instructions required the jury to find defendants not guilty of count I, first degree burglary, as charged in the amended information. (*Mendoza*, *supra*, 23 Cal.4th at p. 901.)

As in *Mendoza* and *Preciado*, count I expressly alleged robbery in a particular degree, the jury received instructions on that particular degree, and the verdict form gave it only one choice of finding Bailey guilty of that degree. The only verdict the jury could return in this case was for first degree burglary. (*Mendoza*, *supra*, 23 Cal.4th at p. 901.) Given the nature of the amended information, instructions, and the verdict form, the robbery charged in count I was not a crime "distinguished or divided into degrees" to trigger the application of section 1157. (See, e.g., *Sanchez, supra*, 102 Cal.App.4th at pp. 1269–1273.)

Bailey argues that this case is identical to the first verdict returned in *Bonillas*, which was found to be incomplete in violation of section 1157. *Mendoza* addressed *Bonillas* only to the extent of approving the trial court's decision in that case to resume deliberations on the degree of murder, and held that such a procedure was not barred by section 1157 or *McDonald*. *Mendoza* did not address or distinguish the validity of the first verdict in *Bonillas*. (*Mendoza*, *supra*, 23 Cal.4th at p. 918.) In any event, *Bonillas* is distinguishable because the information in that case charged the defendant with murder without specifying a degree, which is similar to how the defendant in *McDonald* was charged.

## VI. Reversal of count VI, receiving stolen property

In count I, Bailey and Brown were convicted of the robbery of Garcia. In count VII, Bailey was separately convicted of receiving Garcia's stolen property. Bailey was sentenced to the third strike term of 25 years to life for count VI, plus four years for the gang enhancement, and the court stayed the sentence pursuant to section 654.

A defendant may not be convicted of stealing and receiving the same property. (*People v. Ceja* (2010) 49 Cal.4th 1, 4; *People v. Smith* (2007) 40 Cal.4th 483, 522.) Bailey contends, and the People concede, that he could not be convicted of both offenses, and that the conviction and sentence for count VI must be reversed.

## VII. Bailey's conviction in count VII as an accessory

In counts I and III, Bailey and Brown were convicted of the robbery and burglary of Garcia. In count VII, Bailey was separately charged and convicted of being an accessory after the fact to a felony by harboring, concealing or aiding Brown and/or Smith with the knowledge they had committed offenses against Garcia (§ 32).

Bailey contends count VII must be reversed because he could not be convicted of being a principal in the robbery and burglary, and also as an accessory after the fact of the same offenses.

### A. Accessory after the fact

Section 32 states: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

"The crime of accessory consists of the following elements: (1) someone other than the accused, that is, a principal, must have committed a specific, completed felony; (2) the accused must have harbored, concealed, or aided the principal; (3) with knowledge that the principal committed the felony or has been charged or convicted of

57.

the felony; and (4) with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment.  [Citations.]"  (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 836.)  "[I]n determining whether a defendant had the requisite knowledge and intent to commit the crime of accessory, the jury may consider 'such factors as [the defendant's] possible presence at the crime or other means of knowledge of its commission, as well as his companionship and relationship with the principal before and after the offense.'  [Citation.]"  (*Id.* at p. 837.)

"[T]here is no bar to conviction as both principal and accessory where the evidence shows distinct and independent actions supporting each crime.  When a felony has been completed and a person knowingly and intentionally harbors, conceals or aids the escape of one of the felons, that person is guilty as an accessory to a felony under section 32, whatever his or her prior participation in the predicate felony.  [Citation.]"  (*People v. Mouton* (1993) 15 Cal.App.4th 1313, 1324.)

However, "[a]ttempting to escape after committing a felony is an inherent part of committing the felony, involving in most cases acting on a previously formed intent.  Thus escaping does not create greater criminal culpability.  Indeed, although Penal Code section 32 does not expressly so state, California long has recognized that a principal to a felony cannot become an accessory to that felony by attempting to make his own escape.  [Citations.]"  (*In re Eduardo M.* (2006) 140 Cal.App.4th 1351, 1360 (*Eduardo M.*).)  *Eduardo M.* noted that, were the rule otherwise, "every felon who tried to escape apprehension by fleeing from the crime scene thereby would become an accessory to his own felony, a result that would turn nearly every felony into two separate crimes and thus expand accessory liability beyond any reasonable relation to increased criminal culpability or societal harm."  (*Ibid.*, fn. omitted.)

*Eduardo M.* concluded dual liability could not be based on the mere fact that a person aided an assault and then fled after the commission of the assault, "even if that conduct incidentally helps other principals to escape."  (*Eduardo M.*, *supra*, 140

58.

Cal.App.4th at p. 1359.) "[I]n order to find someone to be an accessory after the fact to a felony in the commission of which the person is also a principal by virtue of his or her having aided and abetted its commission, the acts constituting that felony must have ceased at the time of the conduct that violates section 32. Otherwise, the conduct of aiding or concealing a principal with the intent that he or she avoid arrest (§ 32) is subsumed into the conduct of aiding the commission of the crime with the intent or purpose of facilitating commission of the offense [citation], such that the defendant is 'concerned in the commission of a crime' [citation] and is therefore a principal in its commission [citation]. This is because an intent to help the perpetrator get away, formed before cessation of the acts constituting the felony, constitutes aiding and abetting. [Citation.]" (*In re Malcolm M.* (2007) 147 Cal.App.4th 157, 171.)

## B. Analysis

Bailey's conviction for being an accessory after the fact is not barred by his convictions as a principal for robbery and burglary. Being an accessory to a crime is not a defense to principal liability for commission of the offense, but it is a discrete crime based on separate acts of aid. (*People v. Jennings* (2010) 50 Cal.4th 616, 668; *People v. Riley* (1993) 20 Cal.App.4th 1808, 1815.)

When Bailey waited for Brown and Smith outside the apartment complex, and drove them back to his apartment after they committed the burglary and robbery, his conduct of helping them escape was part of the primary substantive offenses and not the acts of an accessory after the fact.

According to the GPS tracking data, however, Bailey was back on North Half Moon Drive at 11:52 a.m. Bailey's criminal conduct did not end when the robbery and burglary were complete and the suspects reached a place of safety. Once they arrived at Bailey's apartment, the suspects forced open the safe, looked through the contents, and dumped everything in Bailey's trash can. Smith and Brown remained at Bailey's apartment. At 2:45 p.m., the officers responded to the alley and found the safe in the

garbage can. Bailey and Jackson testified that Smith left at some point before the police arrived, and Brown left after Tiffany told them the police were in the alley.

Based on this evidence, the jury could have concluded that Bailey harbored Smith and/or Brown in his apartment for several hours after the completion of the burglary and robbery. Bailey's conviction as an accessory after the fact was based on distinct and independent actions after the commission, escape, and completion of the burglary and robbery, and is not barred by his convictions as a principal for robbery and burglary.

## VIII. The prior prison term enhancements

Bailey contends there is insufficient evidence to support the two prior prison term enhancements which the court found true. The People respond that while evidence was introduced to support these allegations, the court should have stricken the prior prison term enhancements because it relied on the same underlying convictions to impose the two five-year prior serious felony enhancements. Bailey declines to accept the People's concession and insists that the two enhancements were not supported by substantial evidence.

While the court found the two prior prison term enhancements true, the abstract of judgment does not contain any reference to these two enhancements and Bailey was not sentenced on them.

Since the court used the same underlying prior convictions to impose the two prior serious felony enhancements, Bailey cannot be sentenced for the two prior prison term enhancements. Regardless of whether the prosecution introduced evidence to support these allegations, the section 667.5, subdivision (b) enhancements must be stricken and dismissed.

## IX. Cumulative error

Bailey contends the entirety of his convictions must be reversed for cumulative error based on his appellate claims. "We have rejected the vast majority of defendant's assignments of error, and when we have found or assumed error, we have determined

60.

defendant was not prejudiced.  Whether such claims are considered separately or together, we find no prejudicial error at either phase of the proceedings." (*People v. Jackson* (2014) 58 Cal.4th 724, 774.)

While we have reversed count VI, receiving stolen property, and ordered the two prior prison term enhancements stricken, those findings are based on discrete errors of law that did not influence the other verdicts in this case.

## DISPOSITION

The conviction as to Bailey in count VI for receiving stolen property is reversed, and the prior prison term enhancements are stricken.  In all other respects, we affirm the judgments of convictions against both Bailey and Brown.


_____

Poochigian, J.

WE CONCUR:


_____

Cornell, Acting P.J.


_____

Gomes, J.

61.